24-1176, Western Missouri, Maxus Metropolitan v. Travelers Property Casualty. All right. Mr. Ackerman, we'll hear from you first. Good morning. May it please the Court. Winston Ackerman for Travelers Property Casualty Company of America. Property insurance covers physical harm to property requiring repair or replacement of the property. Some courts have also held that it covers a physical contaminant if that rises to the level of rendering the property uninhabitable or useless. Neither of those tests was satisfied here with respect to the interiors of Phases 1 through 4 of the Metropolitan building. It's undisputed that Maxus decided to remediate those buildings because of potential health concerns, what it called life safety issues. That's at Volume 3 of the trial transcript, pages 452 to 54, the testimony of Maxus' CEO, David Johnson. Maxus sprinkles the word carcinogen throughout its brief, suggesting that that's the issue here and that was the need for the remediation. But it was undisputed that the evidence presented at this trial that the quantities of microscopic soot that were found here inside the wall cavities were not a risk to human health. The only evidence on that was the expert testimony of Dr. Batterman who said there was no evidence indicating a risk to the tenants. That's Volume 6 at pages 888 and 907. He also said that it would require heavy staining that would be easily visible throughout the space for there to be a risk to human health, that someone could actually get cancer from this microscopic soot. Is there any evidence that the combustion byproducts physically diminished the utility of the building? No, Your Honor. There was only one item that they found among $15.6 million worth of work. They found one item where Mr. Ermitter, their construction consultant, testified that someone from an alarm company had told him that there was one component that looked like it could be damaged. And that was Volume 2 at page 305. Was that the access panel? Yes, that was an access panel for an alarm system component, essentially. Maxis also failed to prove, and that's what I was talking about with Judge Arnold, that there was physical alteration or a physical effect on the property components within the buildings in phases 1 through 4. This is not something a jury could decide as a matter of common knowledge. You wouldn't know that microscopic soot inside your walls is going to be something you need to do something about. There are a lot of people that have a fireplace, a wood stove in their home. There's likely going to be that sort of substance inside the walls because it can blow around. But no one with a wood stove in your home, even if it's in your kitchen, is going to tear down the walls in the way that was done here to do work and replacement, a massive replacement project. And the microscopist, Mr. Carlson, testified there was no sample where he found that it reached even the level you would typically find near a fireplace. That's volume 2 at pages 148 to 49. Now, Mr. Evans might get up and say, well, this was some kind of special soot. It's not like you'd find near a fireplace. And that may be true, but you'd have to prove that with expert testament. You would need a qualified expert to say that this type of soot is going to damage your wiring, and this is modern wiring, so it's covered with rubber substance. This is not old wiring. Or it's going to damage your plumbing, even if it's not wet, so it's unlikely to be corroded. They would need an expert to testify to that, and there was no expert testimony supporting that. And the reason why this case matters is not just this verdict here, but we now live in a world where wildfires are common, where a lot of people have homes where there may be a wildfire that's half a mile away. Even Canadian wildfires that cause smoke many miles away. As an example of what the result here might mean for other cases, the photographs that were taken here and the videos that were shown in trial came from a security camera on a deli that was across the street from Building 6, the one that burned completely to the ground. And the diagram on Page 6 of our brief shows the location of that deli. So that deli was located a lot closer to the fire than the buildings we're talking about, Phases 1 through 4, which were 100 feet away from the fire, with some buildings in between. So this complex was built around some preexisting buildings, and there were some buildings in this courtyard area in between. So if Maxis' theory is correct, then the insurance company for that deli would have to pay to tear down the walls and rebuild the whole deli because if someone found, using these wipe samples or these air samples, that there was evidence of microscopic soot inside the walls. That really does defy common sense. Is it necessary that they prove that this constituted a health hazard to be a physical loss? I think, Your Honor, it could be either a health hazard that rises to a level of property being uninhabitable or useless. That's really based on Minnesota law. It's not clear that Missouri follows that. But even assuming that Missouri would, they haven't satisfied that standard. The other test would be physical alteration of the property that requires its replacement. I thought they had some testimony. And my recollection is it might have been a former building inspector or something like that who testified that under these circumstances he would have ordered the evacuation of the building or something along those lines. Yes, Your Honor. So that was Mr. Ermitter, who was their building consultant. He is a building code official in Minnesota. But he didn't testify that the building code required this type of work. They never called in the Alabama, Birmingham, Alabama Building Department to tell them do you need to do it. They didn't call in the Health Department to tell them that they needed to do it. So isn't that some evidence? I'm sure you had counter evidence and the jury picked the one that it believed. I don't think you could rely on Mr. Ermitter for that. And one thing I wanted to point out that was not, I think not in the brief, is that Mr. Ermitter was precluded from testifying about various subjects. This is in the record at document 125 and there's another order that's document 196. He was precluded from testifying about health risks, about the smoke, where the smoke went, about the soot test results. So he recommended this work, but I don't think that's enough. Because he's not testifying to a reasonable degree of scientific certainty. He's not a scientist. He has a degree in English. Bachelor's degree in English is all he has. So this evidence would not satisfy the standard for showing that these building components need to be repaired or replaced. Well, the policy does not define physical loss. Is that right? That's correct, Your Honor, but there are multiple. So you're drawing on case law from Minnesota and predicting whether it would be adopted in Missouri? What's the meaning? So there is Missouri case law now. We cited the BBX case, which is a very recent decision in our 28-J letter. Very recent decision of the Missouri Court of Appeals in one of these COVID-19 business interruption insurance cases. And those are the cases recently that have been defining what direct physical loss or damage to property means. So if you look at that case, also the Olmstead case by this Court and the Casey-Hopps, they all speak to the same thing, which is you need to show direct physical loss or damage to property means that you need to show physical alteration of the property or tangible impact on the property. And I think that's also clear here when you take a look at the policy as a whole and you look at it more carefully. So the policy itself says, and I'm looking at page 279 of the Traveler's Appendix, it says we will pay for direct physical loss of or damage to covered property caused by or resulting from a covered cause of loss. And then if you go to the definition of covered property, it has various different components, but the relevant part of it here is permanent works, which is the materials that will become a permanent part of the project when they finish this project. So it's a builder's risk policy that covers buildings that are under construction. So they would have to show direct physical loss or damage, meaning according to the case law, physical effect on the materials, meaning the actual drywall. I mean, they tore out all this drywall, they tore out, replaced all of the building components within these apartment complexes that everybody at trial testified looked very nice. I mean, even their own CEO said this looked like a very nice apartment complex for six months until they hired Mr. Ermitter and he said, you've got a lot of construction defects and you might have some soot inside the walls, so let's test for that. So after seven or eight months, there was one tenant who testified she had no issues, didn't smell anything, didn't see anything. All the people who were there until Mr. Ermitter came and did this testing said, for the microscopics, they all said there was no, you know, they didn't smell anything, they didn't see anything that they thought was, there's only a few photographs of substances that were on some vents that clearly could be easily wiped off. Unless there's additional questions on that issue, I'll move on briefly to some of the other issues. So the prejudgment interest is sort of the second significance. Why do you have one more question on that? What's the significance of the fact that the policy defines soot as a pollutant? So that definition is in a part of the policy that is only for equipment, so it covers contractors' equipment. And pollutants are excluded, so you look to that secondarily. So under property insurance policies, first we determine is there something that's covered? Is there direct physical loss of or damage to property? And then if it is covered, we look to the exclusions and see whether an exclusion would apply. There was no assertion that the pollution exclusion applied to this here, and that pollution exclusion really is only for contractors' equipment. It's not something that's applicable to the parts of the property that we're talking about here. And one other thing. There was a jury instruction, as I understand it, that defined physical loss in this case. And it gave examples of physical alteration, physical contamination, or physical destruction. There's no objection to that instruction, is that right? There was an objection to that instruction because... There is. We did appeal separately, so what I've been talking about is our Rule 15 motion. So there was also, in the alternative, we did argue that the jury instructions on the direct physical loss issue were erroneous and inconsistent with, at that time, the Olmstead decision of this court. And I think you need to sort of start with instruction number 24 and then also read that together with instruction number 18. So instruction number 24, which is in our addendum at page 41, talks about, it says your verdict must be for Maxis on the soot claim if you believe, first, that the presence of soot... Well, I understand you're arguing about presence, and they've got a response to that if you read the instructions as a whole. But I meant the definition of physical loss, the three examples I just read. There's no dispute about that. In other words, you don't dispute that physical contamination is a proper test for determining physical loss. I think only if it rises to the level. So I did object to that instruction, and the objection was that it was incomplete, that you need to say that under this court's decisions at that time, and the subsequent Missouri Court of Appeals decision has confirmed, it should have also said that you have to have a physical effect on the property, and physical contamination would have to rise to the level of something that renders the property unaccountable. Yes. That's an alternative argument on appeal as well. That the instruction was wrong, and it should have required a physical effect? Yes. And you think you've raised that on appeal? Yes. That is, towards the end of our brief, we challenged that instruction as well as the burden of proof instruction. I remember the burden of proof, and I remember the presence argument. I'm not remembering this. Well, here, I see page 59. You've got one page. Let me see that. Go ahead. The presence instruction together with the physical contamination instruction would allow the jury to find for Maxis, would essentially require the jury to find for Maxis, only based on the fact that if they considered soot to be a contaminant, and that it was present. So I don't think under the case law that has developed, including both the Olmstead decision of this court, Casey Hopps, which essentially follows, Casey Hopps is a Missouri law decision that follows Olmstead, and also BBX. Those decisions say that it has to actually have a physical effect on the property, and also if you're talking about something that's contamination, it would have to rise to the level of a serious issue that would render the building uninhabitable. Moving on briefly, prejudgment interest, that's the second most significant issue from a dollar perspective. There was really no definite demand here made. The only thing Maxis cites is a demand that they made in March of 2023, so approximately a little bit less than six months before trial. There's no evidence as to what amounts were demanded and when. There were a lot of issues about allocating construction defect damages. This is mostly on the exterior of the premises, but allocating construction defects as opposed to fire damage, lots of judgment calls, and the microscopic soot issue really was a novel claim. The traveler's witness testified he had never seen a claim like this before where the building itself was not hit by fire, but they're claiming contamination at a microscopic level. We've cited cases that say, Hampton Foods' decision by this court that a novel claim really doesn't warrant prejudgment interest. Children International, that the amount billed, if the amount billed is not what is owed, then you don't owe prejudgment interest. Here the amount billed was not what was owed. Mr. Ermitter had to address that and allocate them by percentage. And then with respect to the business income claim, there's well-established authority by this court, Macheca Transport, and LEPI. We cited a fairly bright-line rule that business income losses are not something on which you can get prejudgment interest. So unless there are questions now, I'll save the remainder of my time for rebuttal. Very well. Thank you for your argument. Mr. Abrams, we'll hear from you. Thank you, Your Honor. May it please the court. In the submissions entering trial, traveler's defense focused on the assertion that soot and combustion byproducts were not found in phases one through four of the metropolitan complex, or if soot was found, it was not the result of the largest or one of the largest fires in the history of Birmingham, Alabama history, which raised just a few hundred feet from phases one through four. At trial, there were several experts who testified. Four microscopists testified. Eugene Marica, Denise Wielder, Neil Carlson, Daniel Baxter, each submitted detailed reports that the soot was consistently found in phases one through five of the metropolitan. Hundreds of samples were taken from air and from services, and the overwhelming evidence demonstrated the presence of soot that could contain carcinogens and posed a danger to the building, which I will get to in a minute. Most of those samples showed high levels of soot. Counsel used the word, I stopped counting how many times he said microscopic in terms of soot. Soot individually is microscopic. In order to be able to tell it from dirt, you have to look under a microscope to tell that it is in fact soot or a combustion byproduct. But the results showed that the soot was consistent with the fire that destroyed phase six of the metropolitan. And there was photographic and video evidence that was presented to the jury that showed smoke embers and char billowing from phase six towards phase five and one through four at the metropolitan. We had an expert, a meteorological expert, Rocco Calicci, who testified about the atmospheric conditions that night of the fire to show how combustion byproducts could have impacted phases one through four. We called an expert, Adam Farna, who is a fire protection engineer, a certified fire and explosion investigator, who explained to the jury how combustion byproducts entered phases one through four of the metropolitan. Now, on appeal, Travelers appears to no longer contend that the soot that was found at the metropolitan was the result of something other than the fire. Travelers now argues that the soot found at the metropolitan did not constitute a direct physical loss or damage to the property, despite the fact that the jury found so. There are several problems with this argument. First, Judge Gaitan's post-trial ruling, he found that Maxis submitted, quote, dozens of reports, photos, videos, and other documents that supported the conclusion that the metropolitan suffered a direct physical loss. And Travelers cannot rationally argue that soot or combustion byproducts are substances that are not capable of direct physical loss. Now, the court was... Their position is it was just sitting there. It didn't cause a direct physical loss. But, Your Honor, the testimony... I'm just asking you. Is that their position? It appears to be now. Originally, it was, well, you know, soot's not there, and if it is there, it didn't get there as a result of the fire. Now, they seem to be saying, well, there wasn't enough soot. They didn't say that at trial? Not really, Your Honor. The focus of trial, the main focus, if you look through the transcript... But I forget about the main focus. Did they mention that as an alternative argument? They certainly argued it to the jury, but the jury didn't believe it. Well, that's different. What's that? That's different. We know the jury didn't believe it. I'm just wondering what they were saying to the jury. You answer my question. Thank you. As to the court asked this question about the definition of pollutant and the fact... You emphasize it, but it isn't part of the definition of physical loss, as far as I can tell. That's correct, Your Honor, but I think that counsel may have misstated the... Why do you think it's relevant? Your Honor, because if you look at page 285 of the appellant's appendix, it talks about we will pay your expenses. It's in section I-1. We will pay your expense to extract pollutants from land or water. It's not just machinery. And then you have a definition of pollutants that comes later on appendix 297. And it says pollutants means any solid, liquid, gases, or thermal irritant or contaminant, including smoke, vapor, and soot. So this is not a novel experience. This is not something that was unanticipated from travelers. Travelers' own policy defines soot as a pollutant. On top of that, well, let's go to this notion that the argument that they're mainly focused on today, that there wasn't enough soot present in phases one through four to cause direct physical harm. Travelers' testimony ignores... I'm sorry, travelers' argument ignores the testimony from experts, including travelers' own expert, that soot is dangerous to human health. It's a known carcinogen. There has not been an agreed standard of how much soot can cause cancer or is dangerous. And it also ignores the testimony of the building inspector, codes official, Tom Ermitter, that there was soot in various buildings. He testified that combustion byproducts left after a complex fire, like the one that we had at the Metropolitan, as opposed to a wildfire where it's just wood burning. Here we have all kinds of processed materials, metals, and so on, that those combustion byproducts can affect Romex wiring. The soot can cause arcing and fire. The soot can corrode copper plumbing and metals in HVAC systems. That's in the trial transcript, volume two, and starts on page 282. In fact, Mr. Ermitter testified that an access control system where the wiring was damaged by combustion byproducts needed to be replaced. That is enough in and of itself to show direct physical loss and damage to the property. It did not come up in appellant's argument this morning, but the brief spends a great deal of time talking about COVID-19 cases that this court has dealt with over the last few years. Soot is not COVID-19. Soot is, first of all, it's a recognized pollutant under the traveler's policy, as we just discussed. Second, this court in Casey Hopps explicitly found that COVID-19, a virus unlike soot, eventually disappears from services regardless of cleaning. And in that case, acknowledged that other contaminants can cause direct physical loss. This court also, in the Olmsted Medical Center decision, found that unlike soot, it had been recognized that COVID-19 contaminated property will return to a non-contaminated state with no intervention because the virus may die on its own in as little as a few hours. There was much testimony at trial that soot does not disappear on its own. You cannot take Windex or Lysol and make it go away. Witnesses testified at length about the details of the remediation process. The other thing that's important to recognize here, Your Honor, to the court, is that travelers did pay for soot removal in phase five of the Metropolitan. So they can't say, okay, well, soot is... And their witness at trial testified that they would not have paid for that soot removal had they not believed that that soot posed a direct physical loss to the property. So they did it in phase five. They didn't do it in phases one through four, apparently now saying, well, there wasn't enough of it. But we have evidence for the jury to, we have evidence from experts that says there was lots of soot there, and it caused damage to the property. That's enough to affirm the verdict. Counsel then talked about the prejudgment interest issue. And as the court knows, the issue is whether the damages are fixed or readily determinable. We have two different categories of damages that we're talking about. We're talking about, one, the damages that we incurred in order to remediate the property. And then we have the prejudgment interest on the business interruption claim. Maxis, first of all, I think the Jablonski case is very informative here. In that case, the court found the amount due was fixed by the insurance policy itself. Because under the insurance policy, travelers is to pay for remediation. We were sending bills consistently to travelers over the years. And they weren't paying them. Those amounts were fixed and readily determinable. The fact that they argued at trial about those damages does not make them not fixed or not readily determinable. Were the invoices sufficiently identified and designated precisely so that they could be associated with this particular claim? Or were there other items in the same invoice that may not have been? No, Your Honor. We submitted invoices to travelers asking them to pay for the remediation. Those were specifically identified in what was submitted to the carrier. On the prejudgment interest on business interruption, counsel made the statement that you can't get prejudgment interest on business interruption, apparently making the argument that it's a lost profits type case. It's different here. Under the policy, we were entitled to business interruption damages of $5 million. Travelers actually paid about $765,000 for business interruption and then stopped. They said, well, it's just taking you too long to remediate the property and therefore just stopped paying. And that's why there's a verdict for $4 million and a quarter in damages. But the analysis of how we got to prejudgment interest, it was submitted by an expert, Michelle Pienta. That was the same analysis of what they paid on the $765,000. So the methodology was not in question. In here, what's different than a lost profits analysis or a pain and suffering analysis is we knew because it took so long to remediate the metropolitan property, by the time you got to $5 million in business interruption, the property was still not remediated. So it wasn't a question about, okay, could you have rented the space? Would you have had enough tenants and so on? We know the metropolitan was shut down so long that it couldn't rent the space. And so therefore it wasn't a mystery. And the calculation that was submitted was the same calculation that travelers actually paid $765,000 on. I want to switch, and counsel didn't get to it, I want to switch to the vexatious refusal piece of the case. And travelers makes the argument that there's a complete absence of probative facts to support a vexatious refusal verdict in this case. And that's simply not the case. There was ample evidence that travelers refused to pay the loss without reasonable cause or excuse. Travelers inadequately investigated the Maxis claim and unreasonably delayed providing coverage decisions in undisputed payments. Maxis had to file a complaint with the Alabama Department of Insurance two months after the fire in order to start getting any payments. Travelers refused to pay for or acknowledge coverage for soot in phases one through four. They did so without issuing Maxis a denial or providing justification for its decision. When Maxis received a report from its expert that harmful soot was found in the apartments which residents were inhabiting, it urged travelers to respond before Maxis had to relocate its tenants so it could safely remediate the property. And travelers responded through its counsel that it would not undertake and quote, will not undertake any technical feasibility, safety, or other review of the reports or opinions of Maxis' expert. And that proved not to be the case. At trial, travelers did undertake and did contest the opinions of Maxis' expert. And on top of this, and maybe perhaps most importantly, travelers engaged an expert, Christopher Spicer, who issued a report on August 2, 2019. Mr. Spicer's report to travelers disputed somehow that the soot came from the fire next door. And from July through October 2019, Maxis repeatedly informed travelers that it intended to sign a multimillion dollar contract to remediate phases one through four, that it was going to need to remove its residents. And nevertheless, travelers sat on that Spicer report for nearly four months, did not disclose it to Maxis. In the meantime, Maxis had signed the remediation contract and began removing sheetrock and other things in order to clean the interspatial pieces of the building, doing major rework. And travelers did not tell Maxis that it was going to contest coverage because of that Spicer report. And at trial, travelers' excuse for withholding the report from Mr. Spicer was that it was quote-unquote preliminary. And Mr. Spicer provided devastating testimony at trial when he said the exact opposite. He said the report was not designated as draft, was not designated as preliminary. And that was a major instance of which Maxis, I'm sorry, in which travelers engaged in vexatious behavior. Can I take you back to the prejudgment interest question? You mentioned the invoices. As I understand it, the district court ran the prejudgment interest from 30 days after your client paid its contractor. Is that right? That's right, Your Honor. Shouldn't the appropriate time be when your client sent the invoices to travelers? Your Honor, it may be in a normal situation. But in this situation, travelers said... There has to be a demand. And your paying is not a demand. Your Honor, we did make the demand. We sent bills. They said we will not be paying any bills. Does the record show when those bills were sent to travelers? I believe so, Your Honor. But more importantly, I would suggest that travelers said we're not paying anything. It doesn't matter. We're not going to pay any of these bills. They completely stopped. Well, I still think you're required to make a demand of a liquidated amount, right? We were submitting the bills to them. But they had said beforehand we're not going to pay anything. So we would consistently do this. It would be essentially a game. We would send them bills. We knew that they were going to get them. And the demand was made by your client of travelers. Your Honor, typically that is the case. But here you had a situation where travelers said we're not paying anything. We're not going to pay you anything. So we're paying these bills. We're submitting to them knowing that they are going to ignore them, which in fact they did. And in fact, and at trial, and really this dovetails into the last piece of the vexatious refusal, at trial they did not have a witness who could testify why they didn't pay, what bills they paid. I mean, every once in a while they would send them. What was the context in which they said we're not going to pay you anything? They said they did not believe that there was coverage here. Essentially their position prior to trial was we don't think that there's soot there. And the soot did not come from the largest fire in Birmingham, Alabama history, which was down. But I mean, had you approached them and said we're going to be doing remediation and we want you to pay and we'll be sending you invoices in the future, something like that? Absolutely, Your Honor. That was the case. And you're saying in that context they said we're not paying anything? We're not going to pay anything. Well, you think that counts as a demand for purposes of pre-judgment interest law? Absolutely, Your Honor. We submit bills to them. No, I mean before you submit the bills. I thought that your point was in a normal case the demand is when you submit the bills. You were saying that's typically the rule, but you said here they told us we're not paying anything. Well, the first time we submit to them and they say we're not paying anything. Then we continue to send bills. But the calculation really should go on based upon when we paid it because they've already in anticipation said they're not going to pay any further bills. So they've already rejected that even beforehand and they made good on that. They did not pay any of those bills. And that's what the court found. Your Honor, I see that I'm out of time. Anything further? Thank you for your hearing. Mr. Ackerman, we'll hear rebuttal. Thank you. I'll try to address a few of the issues that Mr. Abrams discussed. First, he mentioned that soot is a known carcinogen. We all know there's a lot of things that are carcinogens. You've seen the California law warnings on a lot of products. That doesn't mean anything. There really had to be expert testimony that this soot at these levels would cause harm either to people to the extent of uninhabitability or to property, and Max has failed to prove that. Mr. Abrams also said there's not an agreed standard for how much soot is acceptable. I think that goes to in the old days of the Frye standard. Clearly they'd be out of court for that. Even today, Daubert standard, they didn't present any scientific testimony. Any engineer, anyone with appropriate expertise to demonstrate that there was harm here. There was some discussion about travelers paying for soot in Phase 5. Phase 5 was completely different. This was right next to the Phase 6 fire. There's a couple of photographs in our reply brief. Phase 5 was clearly hit by very visible soot. The Bomasada got a report from a company called ATC. Travelers did pay for the work that they proposed to do, but this was a totally different situation than what was done in Phases 1 through 4. With respect to prejudgment interests, Mr. Abrams discussed the Jablonski case. That was an art professor who was making a claim under a homeowner's policy for some destroyed artwork, and she demanded a specific amount and explained what she had gotten for similar work in the past that she was selling. Totally different case. I think this Court should look to the Robinson decision by the Missouri Supreme Court, a 2020 decision that explains that prejudgment interest is not owed or the valuation of the claim is not determined until trial. That clearly was the case here. I'll try to touch briefly on vexatious refusal. There was a lot of testimony about whether travelers would advise Maxis about whether to do this remediation. Travelers was very clear that it does not advise insureds in any circumstance about whether to evict tenants, about safety issues. That creates liability for an insurance company of a different kind, and they don't make those decisions. They don't tell you what to do. You've got to make your own business decision on things like that. With respect to the colloquy with Judge Grunder about prejudgment interest and when it ran, the record does not show when they sent the bills to travelers. The first time that happened was in July of 2022, which was quite a while after the work started. Travelers did pay some of this. The notion that travelers did not pay is just wrong. It's not what the record shows. Travelers undisputedly paid over $7 million in this claim before trial. That's Defense Exhibit 31. There were a lot of issues about, well, was this work being done in Phases 5 and 6? Was this for microscopic soot remediation? That had to be sorted out. The contractor was not always clear about where the work was being done and what it was for. That led to some issues. Unless the Court has questions, that's all I have.